Yes, good morning ladies and gentlemen. Our first case for today will be United States against Vargas, Mr. Brindley. May it please the court. My name is Beau Brindley and I represent defendant appellant Josue Vargas. Mr. Vargas appeals from a number of district court rulings at trial as well as the court's ruling on his motion to suppress. And I would like to begin by addressing that motion to suppress. The government's argument against Mr. Vargas' position focused almost entirely on the question of whether Mr. Vargas has a reasonable expectation of privacy in that gated truck lot. But while we contend that Mr. Vargas did have such an expectation of privacy, a reasonable one, in the lot that he rented, what the government seems to ignore is that regardless of the expectation of privacy, the Fourth Amendment can also be violated by physical intrusions, such as was the case in Jones and Jardine, which we cited in our brief. So Mr. Brindley, let me ask you this question. It appears that the officer's trespass was not onto some designated parking place that Mr. Vargas was leasing. It instead seems that the officer trespassed into the common areas. And if that's the case, then why is Mr. Vargas the one with a protected Fourth Amendment interest there? Well, I think there's two parts to this, Your Honor. First, the officer sneaks into the gated truck yard. That's the part I'm talking about. I want to put the other things, because I actually think the whole thing hinges on that. But when the officer does that, sneaks in behind the truck or whatever it is that lets him in, he's standing in the common areas of the parking lot. And I want to know why it is based on the various cases that talk about common areas, whether it's a hallway, whether it's a foyer. It's the owner of the property that has the protected interest there. It's not the individual tenants or lessees. Your Honor, I think the answer to that question is that the individual people that have, if it was an apartment, certainly in the common area, and there was a dog being brought for a sniff outside the apartment door under Jardine, that would be a violation of the Fourth Amendment. But that's because it's right up on the door. If the dog is just wandering around the lobby of the apartment, the apartment owner can't do anything. But the dog doesn't do that. The dog actually is right adjacent to Mr. Vargas' tractor trailer. And in that respect, I believe Mr. Vargas' tractor... But you're confusing the... Now, I want you to stick to the first entry. Yes. Because if we can establish whether that was legitimate or not. If it wasn't legitimate, then I think your argument, as I understand it, is everything else that happens thereafter is tainted. But if it was legitimate, or at least if Mr. Vargas isn't the person whose interests were infringed, then we have a different problem. Your Honor, we would take the position that Mr. Vargas or any other members that had trucks in assigned spaces that they had leased in that gated lot, any of those people would have their... It would be an intrusion into their interests, whichever one of them ultimately ended up having an issue with what law enforcement was doing in there. And of course, the law enforcement officer getting in there without permission is the only way the dog comes in at all. Everything comes because he's in there and he sees the truck and then he gets the dog in there after the fact with other officers. Now, does it matter that this was a chain link fence and the officer actually could have just walked up against the fence and taken much the same picture with his phone or a camera? I think it does matter. It does matter for a couple of reasons. I don't think that's true. I don't think he could have seen Mr. Vargas' truck where it was through this fence in that way and identified it. Secondly, he wouldn't have been able to get... The only reason he was able to get access for the other people to come in is he was already in there and waved to some other guy to push a button to let those other people in. If he wasn't in there, there's no reason to suggest they could have even gotten the dog in. And the dog is the key to this whole thing to getting into Mr. Vargas' truck. So that's how I view that. I think that the involvement of the narcotics canine here separates this from the situation we had with the lock and key in Concepcion, which is a different situation. Here they're bringing the dog and the Supreme Court has said that bringing a dog for a canine sniff in an area that's open to the public, be it a hallway or a porch, that is a violation of the Fourth Amendment. And people who are leasing a spot... It seems like an overly broad statement given Cabalas, but... Well, the question is whether or not... Does it make any difference if it's a vehicle? In my judgment, it does not. Well, in your judgment, but does it make a difference? Not according to the case laws announced in Jones. That's not the way the cases are written, though. They're not dealing with vehicles. Well, Jones does. Jones does deal with a vehicle. Jones involves a vehicle that's out in the public where anyone could go there and put their hand on it and placing a tracker under that car in a public place, totally public. That intrusion violates the Fourth Amendment. It's the intrusion. And I believe the intrusion there is arguably less intrusive than going into a place that a person has paid to have his truck secured, going in there without permission, sneaking in there, in fact, and then getting a narcotics dog to go up and sniff his vehicle, which he has paid to have secured in that area. And so I believe that's an even greater intrusion than what we see even with the tracking device, which is just setting it on the car where anybody could do it. But it was that man's car. I mean, that's, I think, the difference between Jones. I understand that there are the two lines of Fourth Amendment jurisprudence. There's the direct trespass line that the court has said didn't go away after Katz, and there's the reasonable expectation of privacy line. But they're not supposed to be blended. And I'm not sure where the trespass of Mr. Vargas' property took place. I understand that there aren't, in fact, clearly marked parking lines in this lot, that it's just sort of an open lot, and people can park whatever number of vehicles they've arranged for. They have to buy a certain number of spots. He had two, actually, Mr. Vargas did. But it doesn't say in the lease you have spots two and three. The lease does not say that, although the evidence of trial suggested, as I recall it, the evidence of trial suggested that the same spaces were kept by certain different individuals that had their trucks in the lot. The lease did not specify that, I agree. Nonetheless, Your Honor, to put it this way, if law enforcement goes into the common area where they're not allowed for the purpose of an investigation and ultimately conducting a canine sniff, which is what they were doing, that's what they were going to do, when they do that into a space that people have every reason to believe law enforcement is not going to be intruding for that purpose with a dog, like on the porch, for example, of a house, we believe that is the same thing. We believe that is analogous if the common area is locked and secluded, and the whole purpose of that is to keep your item safe and secure. What about the Sweeney case? How do you reconcile cases dealing with other kinds of common areas? This is a commonly used basement, and we didn't find, as you were suggesting, that Sweeney had an individual enough interest to keep people out. Well, I think one of the problems here is that ultimately the narcotics canine isn't the issue in that case. But there's the predicate question. Do you have a protected interest? The dog isn't inside the truck, right? The dog is wandering around the truck. I'm not interested in the dog right now. I'm interested in whether Mr. Vargas has an interest in the common part of this parking lot. And our answer is yes, he does. And why it isn't like a commonly used basement of a multi-unit building or other kinds of, I mean, condos have a common... Well, the commonly used area here was not, in the Sweeney case I should say, not here, was not meant to seclude any particular piece of the owner's property that he put there for the specific purpose of having it secured. That's the difference for Mr. Vargas's truck. In this area, the purpose of the area is for Mr. Vargas not to just use it commonly for some sort of common purpose, but to secure a particular piece of his personal property. I understand, but when the officer sneaks in and takes the picture of it, he's not physically touching the truck. He's back taking a picture of the truck, which then gets shown to the other guy who says, yeah, that's the truck. Right. But he's not touching the truck. He's standing, as I understand it, in the common area of the lot. He is standing in the common area of the lot. That is true, but he's standing in the common area of the lot to investigate a piece of property, the truck, that Mr. Vargas has specifically and intentionally put there for the purpose of protecting it. And none of the other cases involving... But he's not opening it up. He's just doing something that's roughly in plain view. He's standing in the lot, and he can take a picture. Sure, but that's not that much different than the Jones situation where you can walk up and set something underneath it. It really isn't much of a distinction. The difference is that it's this man's property. In Jones, it was the individual's property that suffered the trespass. And in this instance, being able to get access to Mr. Vargas' truck and take a picture of it for law enforcement purposes is similarly equivalent to what happened in Jones. He can't take that picture from anywhere else. There's no evidence saying that he can. He has to get in there for that purpose. And what I think is important, and this gets back to your question about Sweeney, is the purpose of that public area is to protect a certain piece of property and keep it secure. And that's not the case in Sweeney, nor is it the case in Concepcion. Nothing is being secured in those areas. That makes this different, and that's why we believe this is a Fourth Amendment violation. The government can't argue attenuation because it all comes together. There's no break in the chain. They don't even argue that. And so we believe that it should be remanded as the evidence should be suppressed due to Fourth Amendment violation. Now, I want to move next to some of the... There was a litany of trial court errors that made this a very, very difficult case for Mr. Vargas in terms of simply the appearance of fairness and the ability to conduct the defense. To start with a couple of those, there was evidence available that the cooperating witness's uncle was in the drug trade, had access to the truck lot, knew where Mr. Vargas's truck was, all of those things. So it was a third-party alternative suspect that could have been hiding the items in Mr. Vargas's truck. That's what Mr. Vargas testified must have happened. But he couldn't say anything about what that uncle was doing. Well, the uncle's by now in a Guatemalan prison, is that right? By now he is, but not at the time. But he wasn't at the time. Correct. And what we wanted to do was cross-examine Mr. Wetter about, well, your uncle's in... Have you moved drugs for your uncle? Have you been in that truck yard with your uncle? To see if he and his uncle, he may be trying to protect the uncle. Certainly, to protect the uncle and incriminate someone who's not in your family, that's something that can happen. It makes sense. Denying us that opportunity altogether, not allowing those questions, denied Mr. Vargas... It violated the Confrontation Clause. It was a source of bias in terms of the uncle, a source of a reason to lie, that we didn't get to examine. And that violation of the Confrontation Clause, when it happens, and we do as the court says, and we assume that that violation was fully realized, that would mean that the jury would conclude that Mr. Wetter was incredible and that there was an alternative suspect. That by itself is enough to reverse, but that was only one of many of these things that happened. Cross-examination of the essential witness, Mr. Wetter, was cut off entirely. But, you know, the third-party culpability doctrine... Yes. It's sort of easy to say somebody else did it, and I wonder what your strongest evidence is, or would have been if you'd been able to pursue it, that this uncle was actually involved enough that he was the suspect. Well, the strongest evidence was he had been... His truck, the uncle's truck, according to the transponder evidence... The uncle's Duran, right? Duran. Duran's transponder was activated on that night, the very night that Mr. Vargas and everyone is supposed to be going to the truck lot. Duran's transponder was activated. He'd been in the truck lot. Or someone with his transponder had been in the truck lot. Maybe it was Wetter. But whoever it was, we had that. And if we could combine that with the fact that this person, Duran, was someone that was in drug trafficking, that Wetter knew it, that Wetter had, we believe, Wetter had been involved in transporting drugs for him in the past, we believe that Mr. Morales, another witness, would have been able to corroborate that with some evidence he had about things he had seen of Mr. Wetter. And this is all in some kind of... There's a lot of evidence that you're talking about, I think, to put all of this together. It would be, and we couldn't. The problem is we didn't even get to go anywhere near it because the district court refused to permit it. Even as a proffer. Yeah, no, yes. No, it wasn't permitted at all. And then it's just made worse by all of these other errors between the cutting off of cross-examination altogether when all that was being requested was a sidebar to clarify what he was talking about. Because what happened was, for some reason, the court thought it was inappropriate to ask the witness, did you lie during this December interview with the agent? I still don't know why. But whatever the reason, then changing to more specific questions about what was said during the interview compelled the court to say, well, I've warned you once already, you can't talk about that interview. Well, to anyone who's trying the case on defence, that makes no sense. Why would the whole interview be off-limits? So the only thing that we could do, or that I could do, it was me, the only thing I could do was ask, may I have a sidebar? This wasn't like one of the cases the government cited where counsel got upset and was engaging in disrespectful conduct to the court. This transcript doesn't read like that, because that didn't happen. We asked for a sidebar twice, because he wouldn't explain, and then he just cut off cross. And it was bad enough that the government, sui sponde, comes back and says reopen it. And so one of the questions is, to what extent did that action fix things? Partially, at least. To some extent, but the extent is simply not enough. The only thing it was reopened for was to try to ask some questions about that interview. But other questions we never could get to that we would have gotten to in other circumstances. Questions about whether there were more serious charges in the state of Ohio that got dismissed because he was going to cooperate against Mr. Vargas. Questions about the fact that he had admitted extensive additional federal criminal conduct that were never charged as a result of cooperating against Mr. Vargas. We weren't able to question whether or not after he's repeatedly lying to law enforcement, he admits in the beginning of the cross, it just comes out he's lying, and then he keeps going back to the old mantra of, well, all I have to do is tell the truth, and if I don't, I'm in trouble. Being able to ask and get the jury to see his answer to the question, well, you've already lied all these times, and you've still got your deal. You don't really believe that you have to tell the truth, do you? Those are essential and important questions, not just to be able to ask, but to have the jury see how he answers. And all of that was eliminated. All of that was prevented by this cutting off of cross-examination and a series of other interruptions and errors, cumulative interruptions, continually for the defense. This is a case... I've tried many, many cases before this court. As you all know, I'm here regularly. And I have never seen a situation like this where we are trying to simply do the very same things we do in every case. And at every turn, the district court is coming up with these strange reasons to suggest we're violating the rules. For example, you can't ask, approximately what time is somehow an inappropriate question. But when the government asks approximately what time, it wasn't an inappropriate question. And that happens repeatedly. And when you have that accumulation of errors, the government would have to prove beyond a reasonable doubt that it is harmless under Chapman. And that can't be done in this case where we were limited from our third-party culpability, we were limited in terms of cross-examining the main cooperating witness, and we were depicted before the jury as being somehow violating obvious rules and just things that everybody knows, which in fact, objectively, what the court was saying were not obvious rules. These rulings were arbitrary and, to my view, to this point, senseless. I still don't know where they came from. And for that reason, Your Honor, we believe that the case... How many cases have you tried before Judge Norgal? Before Judge Norgal? At least two jury trials, Your Honor. Two jury trials. And I will say this. What happened in the Vargas case was much, much distinct and far different than the situation in the case of United States v. Alexander Vasquez, which was complicated, but nothing like this. With that, I'll reserve the remainder, Judge. Thank you. All right, thank you. Mr. Fullerton. Good morning. May it please the Court? The district court correctly denied the motion to suppress in this case. Mr. Vargas did not have a reasonable expectation of privacy in that common truck yard such that it was a violation of the Fourth Amendment for the officers to enter the truck yard and examine his truck. At first, they just took a photo of the truck. They confirmed that it was the one that was at issue. Could I ask you whether, through the chain-link fence, this truck was visible? There's some pictures in the record of the fence. Right. From the pictures that I've seen, it would have been visible, but one of the things that was examined may not have been visible from through the fence was the name on the side of the truck as well as the phone number on the side of the truck, which helped further identify the truck as the one that the cooperator had identified as belonging to. Is that how he pronounces his name, Wetter? I believe so. I've struggled with that pronunciation myself, but Mr. Wetter had identified a truck, and I think it included the name and phone number on the side of the truck that helped identify it. So there are aspects of this picture that had to have been captured from inside the perimeter of the lot. I think the photos that are in the record were taken inside the perimeter. But Mr. Vargas didn't have an expectation of privacy that would have excluded the officers from entering the common lot and looking at his truck and taking a photograph of his truck. The district court found that Mr. Vargas didn't have a property interest in that truck yard such that the officer's entry would have violated his expectation of privacy or would have constituted a trespass against that interest. Well, it's a trespass against somebody's interest, but maybe not Mr. Vargas'. Right. And the owner, Anjud, or whoever they were who owned this yard, surely had suffered a trespass when the officer sneaks in. And it's not only because... Has there been any evidence in this case about whether the owner objected, the owner of the lot objected to the entry? Not that I'm aware of, Your Honor. Okay. One reason, among the reasons why Mr. Vargas didn't have a reasonable expectation of privacy, in addition to it being a common truck yard that he didn't own, was that he had consented in his lease to... I don't like this theory of yours at all, and let me explain why. This lease says government officers can do some things, enforce the law, and it also says that you can't have contraband. But every CHA lease that I know of also says that the residents of CHA housing units can't have contraband in their units. But those are not regarded as waivers of the Fourth Amendment. If the police want to search a CHA resident's apartment, they have to go get a warrant, just like anybody would. And so I think you're over-reading this lease significantly. Well... Now, you may have other reasons why the initial... I think if you can get past the initial entry, then I think everything else follows. If it's bad, it's all tainted. If it's good, then the dog comes, the dog sniffs, and it's like Cabalas and so on. Right. I think the reason I bring up the lease is because it goes to Mr. Vargas' diminished expectation of privacy in that yard. I don't think so, and I'm worried about your conflation of the Supreme Court's trespass line of cases and their CAT's reasonable expectation of privacy lines. If there's a trespass, there's a trespass. If it's Mr. Vargas' property, it's Mr. Vargas' property. If it isn't, it'd be like me trying to complain that the police have trespassed on my next-door neighbor. Which, of course, I can't do. So what we do know from the record is it was not his property. He did not lease a particular space. There was no either physical barrier or physical demarcation of his space within that common area of the truck yard. Did the district court ever make any... This is a little bit ship's passing in the night briefs. Mr. Brindley is saying that there were particular parking places and everybody knew where they were, and the government is saying, oh, no, it was just sort of this big, giant lot with nothing visible in it. The district court did make a finding that Mr. Vargas did not have a specific spot. But are the spots outlined at least? I believe the court also found that there was no demarcation of one spot versus another. It was an open truck yard that the truckers used as they could. And given that there was no trespass there, we don't think that the bringing in of the dog and the trespass enforceable by Mr. Vargas, bringing in the dog, further examining the truck, developing probable cause, and ultimately searching the truck constituted a Fourth Amendment violation. Now, as for the conduct of the trial... What I am most concerned about, actually I find it a bit preposterous, is the government's position about the expert. Because this guy, Rashke, is an old familiar. I mean, Rashke shows up in case after case after case about cell site data. There was not a thing the defense could have told the government about Rashke's investigation, about what his approach was, about what he was likely to say, that the defense hadn't gotten directly from the government. And so I think the notion that this man had to be excluded when he was proffered as a defense expert, when you guys decided not to use him, just doesn't seem at all consistent with the purpose of the rule or even the scope of the rule. Well, Rashke... And Rashke, I mean, I feel like I've seen about five cases that Rashke's shown up in. I mean, he's not a stranger. He's not a stranger. Rashke's testimony, however, for the defendant, the purpose of it, the scope of it... He wasn't going to be able to... He wasn't likely to say for the defendant, I investigated things that I never told the government about. You knew the full scope of what he had done. The government might have known what Rashke had done, but it wasn't clear what the purpose that the defense was offering him for. That doesn't matter. What purpose would it be? The only thing Rashke does is he figures out where cell phones are vis-à-vis the location of cell towers and draws inferences about, you know, maybe if the person was there, that tells you something. I mean, there's been criticism of this approach as well, of course. It depends on the towers. Well, I understand, Your Honor, and the district court here found that this was a violation of the disclosure rules and... I think that's preposterous. Rashke's on the list. He's sitting there in the courtroom. Do you now want some rule that defense counsel has to cross-designate every expert on the government's list just in case this comes up? What would happen? There's a reciprocal discovery obligation where if you ask, the opposite side has to provide a notice of its experts. So henceforth, in the district courts of the Northern District of Illinois, the defense will just routinely say, and we might decide to use the government's experts too, and they'll file a piece of paper that says that. That's what you want? I don't know if I'm saying it's needed. You are saying it's needed. You're saying he can't use the experts. But it's typical that that occurs, isn't it? If you plan to call an expert, you disclose the expert. But why would they have needed to do that? Since you had Rashke on your list, they thought that Rashke was going to be on the stand. You pull him at the last minute, and so they think, yeah, but we wanted Rashke on the stand. What function? I can see the formal argument you're making, but what function is being served? You didn't know enough about what Rashke was going to say to cross-examine him? You know, I think it was a matter at that point of being deep in the trial, the last day of evidence, and the district court concluding that this would prolong the trial, complicate matters, that government was unprepared for what purpose the defense was going to call Rashke. They were prepared to call him... But you sound like Rashke was an encyclopedic witness. You knew what Rashke had done. The calls are on the chart that you created. But there were calls beyond the charts. As I understand it, there were calls beyond the charts, beyond the scope of what Rashke had done for the government that the defense wanted to call him for. Now, ultimately, however, even if there was error in the district court excluding Rashke's testimony, I don't understand what the prejudice would have been to the defendant. Because Rashke, again, as I understand the defense's point about Rashke was he was going to place... Rashke's testimony for the defense would have placed Vargas and Morales at places regarding cell towers consistent with their trial testimony. Now, their trial testimony placed Morales and Vargas at the truck yard in Chicago at the time that Hueter said he met Vargas at the truck yard and received the cocaine from him. There might have been some play in the joints in terms of when the transponder showed the gate was open and when the witnesses said they arrived there and when the calls... But that problem was common across the board. In other words, the anticipated testimony of Rashke for the defense, as I understand it, was not going to place Vargas in New York City at the time that Hueter said he met him at the yard and got cocaine from him. It would have placed Vargas, consistent with Vargas' testimony according to the defense, at the yard on that night when Hueter got the cocaine from him. I don't think that that's sufficient prejudice that even if there was error in excluding Rashke's testimony that a new trial is warranted. As for the other alleged trial errors, the uncle, the defense about the uncle, the district court excluded that on the ground that it was basically the sheerest speculation to say that the uncle, Hueter's uncle, Cesar Duran, had anything to do with the cocaine found in Vargas' truck. What about the transponder? That it was Duran's transponder that evening? I don't recall that testimony. What's disturbing is that the judge prevents the development of even enough of a record for us really to review some of these things. I don't agree with that, Your Honor. I think the judge, when the motion to eliminate was brought up, the judge asked the defense, asked counsel for an offer of proof as to what this would consist of. The offer of proof was that Hueter's uncle, Cesar Duran, had been involved in the drug business. That's not very probative about whether Cesar Duran had hijacked defendant's truck to store cocaine. He had been involved in the drug business. He had one time had a truck in that yard and Hueter knew about it. That's it. That's the only offer of proof. Mr. Brinley just said the transponder was used that night. That part I don't remember. I don't think that was part of the offer of proof. At any rate, the motion to eliminate  One purpose of the motion to eliminate was to preclude cross-examination of Hueter about these issues. It didn't preclude the defense This motion to eliminate was brought up at the very beginning of the trial, actually after opening statements. It wasn't revisited at the close of the government's case when the defense could have said okay, now it's our turn to present a case. We'd like to call Hueter and Hueter will testify X, Y, and Z. It didn't do that. The district court also didn't preclude Mr. Vargas or any other witness from testifying about this theory of Cesar Duran and Hueter being the person responsible for the cocaine. From the offer of proof, it was as I understand it, the defense was designed to invite the jury to speculate that Cesar Duran was one time involved in the drug business and must have been the one responsible. That was it. And the district court was within its discretion to preclude that on the basis. As for the cross-examination of Hueter by counsel That reminded me of a Monty Python skit. It seemed that no one was understanding what anyone else was saying and it just the judge wouldn't let him ask questions that are pretty routine questions to impeach a witness's credibility. And then just sort of went off the deep end to the point that he comes back, but only for impeachment not for really a more thorough examination. A couple things, Your Honor. Hueter was a difficult witness I think. And he was a difficult witness I think for everybody. But on cross-examination he was difficult. He spoke through a translator. He was not that sophisticated. He didn't appear to have a good memory. All of which are impeaching kind of off the bat. But counsel was able to very effectively impeach Hueter regarding his plea, his prior lies his motive to invent and blame others. He impeached him about his previous inconsistent statements both to the officers in Ohio as well as to the DEA agents in Chicago and an alleged and a supposedly inconsistent statement to the grand jury. What counsel was I think quite effectively able to impeach Hueter, it didn't go as smoothly as counsel would have liked. And I agree the transcript does not read smoothly. But I don't think there was anything that the district court did that either prevented counsel from impeaching him or that precluded some area of Well he does shut him off from exploring that December statement. He says we're not going to talk about this anymore and then the conversation continues and the judge just says you're done. Well there is that there was an episode in the trial and then the parties agreed and asked the judge and the judge agreed to bring Hueter back for further cross-examination on that very subject. But only on the impeachment point. That was the government's motion at least. Well counsel didn't ask the judge to well a couple things. One is when the parties requested that Hueter be brought back for further cross-examination counsel didn't, as I read it I don't think the district court specifically designated simply impeachment regarding the December 2014 report as the only permissible area of cross-examination. But why would he have had occasion to do that if the scope of the government's motion was just bring him back for impeachment? Cross has reopened on the government's motion and that talks about further impeachment. So why would the judge have any reason to grant more than the government was asking for without at least telling people? Well all the other areas that he said he wanted to go into were also impeachment. And when counsel finished this extended cross-examination, resumed cross-examination of Hueter, counsel didn't say your honor I have other areas that I want to go into it was I have no further questions for the witness. So it appeared to the district court that counsel had concluded his cross-examination Hueter was thoroughly and effectively impeached, but his testimony was corroborated by the evidence. So we don't think there was any error. Any error, if there was an error here, it would have been harmless because the evidence showed that Vargas's fingerprints were found on two of the 11 kilograms of cocaine. Can you explain where the finger, I thought I read some place that the fingerprints were somehow in the underside sticky part of the tape as opposed to, is that right? It wasn't tape, your honor. The prints were found on a plastic wrap. Plastic wrap, okay. That bound up the kilos. The kilo packages. Like a saran wrap sort of thing? Right, saran wrap idea. And as I understand the testimony and the argument of the parties, there was significance to the location of the prints on or within the plastic wrap. That would suggest that Vargas's print had not been left on the saran wrap in its unrolled form and then used by others to wrap a kilogram. Because again, as I understand it, it's a little tricky here, but as I understand it, Vargas's print was found within the plastic wrap. In other words... Like some internal layer or so? Right, an internal layer. Such that he could only have left the print on the saran wrap or plastic wrap at a time when the kilo was actively being bound up in the plastic wrap. Okay, just curious. For all these reasons, your honor, we ask the court to affirm the judgment and conviction below. Thank you. Alright, thank you. Mr. Brindley. Thank you, your honor. To begin with, the fingerprints in this case don't render this harmless beyond a reasonable doubt. If you go back and look at the arguments, there's arguments on both sides about where those prints were. The defense position where they could have been on the outside of this big roll of plastic. The government tried to say otherwise. And there was somebody else's print on there too. So, the fingerprints aren't enough when we have everything that happened in this case. With respect to the suppression, I want to say this. In that truck yard, a portion of that lot, whichever portion it was, was Mr. Vargas's. Just like a portion of an apartment building is the portion. And trespassing to look into his portion is a trespass that should render this a Fourth Amendment violation. With respect to Agent Rasky, he would have corroborated not just when they were at the lot, but there was disagreements with Huerta about who was at the hotel and when they went to the hotel. We could have used those same plot points that the government had given us. I have never even thought of the possibility of having to send them a notice and say, oh, if you decide not to do what you just told me you're going to do, I'll call that witness. That doesn't happen. Wait a minute. That's not totally true. That happens many times in trials. Very. Never have I seen that happen with the same expert witness. We usually have different experts. You trade with respect to competing witnesses. And then, ultimately, with Mr. Huerta, there were sources of bias. This is, it seems to me, a question about the rules. What rule are you relying on for the proposition that you don't need to cross-designate the other side's witness? I've gone back and re-looked at your brief, which is citation-free, but this is, in the end, a question about what the rules require. So, what is it you're relying on? Judge, I am not relying on any particular rule. Well, the rules determine how you have to designate expert witnesses and whether you need to cross-designate the opponent's expert. You can't just say we're operating in a rule-free zone here. We need to think about what's actually in the rules. Your Honor, I understand that. Within the situation that we were in and the practical realities of that situation, we did not believe that it was any violation of the rule to permit that testimony. As I say, your brief does not discuss any rules. It doesn't say, here's why we had a reasonable interpretation of a rule. It doesn't mention the rules. And with respect to that, Judge, we believe that in terms of the policy basis for these rules, what happened here was simply a treacherous to the defense. Which rule? The policy basis for which rule? The rule requiring designation, your Honor. The reason to designate an expert is so that the party knows what he's going to say. We were going to call that witness to say the very thing that they told us he was going to say. And so we do not think that the spirit of that rule, so everybody knows what the testimony's going to be and the opinion will be, was going to be violated by doing that very thing. But you didn't follow the rule, did you? We didn't cross-designate. You didn't follow the rule? Absolutely not, because we didn't think there'd be any possibility to be necessary. Well, absolutely not, because it's sufficient. You didn't follow his rule. No, and I don't think anybody else would have under these circumstances either. But in terms of, if I could make one other point, Judge, and then I'll be done if that's okay. With respect to Mr. Wetter, there are independent sources of bias that were not cross-examined, and there was just a continual diminishment of defense counsel and suggestion that Mr. Vargas' defense was somehow wrong that combined to be too much. Thank you, Your Honor. Thank you very much. Thanks to the government as well. We will take the case under advisement.